```
 1                    UNITED STATES DISTRICT COURT
 2                    SOUTHERN DISTRICT OF FLORIDA
 3                    CASE NO. 09-20044-CR-HUCK
 4  UNITED STATES OF AMERICA
 5
 6        vs.
 7  RICARDO FIGUEREDO,
 8              Defendant
 9
10                  SENTENCING HELD 4-14-09
11              BEFORE THE HONORABLE PAUL C. HUCK
12                 UNITED STATES DISTRICT JUDGE
13  APPEARANCES:
14  FOR THE GOVERNMENT:      MICHAEL DAVIS,
15                           ASSISTANT UNITED STATES ATTORNEY
16
17  FOR THE DEFENDANT:       DAVID EDELSTEIN, ESQUIRE
18  REPORTED BY:             PATRICIA SANDERS, RPR
19                           Official Court Reporter
20
21
22
23
24
25
```


EXHIBIT D

2

```
                         I N D E X

                          DIRECT      CROSS     REDIRECT

 KEN VEGA                   3          13
```

```
 1              THE COURT:  We're here in the United States versus
 2    Figueredo.  May I have appearances, please.
 3              MR. DAVIS:  Good morning.  For the United States, Michael
 4    Davis.  With me is Special Agent Luke Methot of the United States
 5    Secret Service.
 6              MR. EDELSTEIN:  Good morning. David Edelstein on behalf of
 7    Mr. Figueredo.
 8              THE COURT:  Good morning.  We have a number of objections.
 9    The first one is the Government's objection regarding paragraph 22.
10    Apparently it takes the position that the loss was more than
11    $20,000,000.
12              MR. DAVIS:  Yes, Your Honor.  We are prepared to prove that
13    through the testimony of a witness.  We're prepared to proceed.
14              THE COURT:  All right.
15              MR. DAVIS:  The Government would call Ken Vega.
16   Thereupon,
17                              KEN VEGA,
18   having been first duly sworn or affirmed, was examined and testified
19   as follows:
20   BY MR. DAVIS:
21   Q.   Mr. Vega, tell us how you are employed.
22   A.   I am a senior investigator with Bank of America corporate
23    security.
24   Q.   How long have you been with Bank of America?
25   A.   For approximately ten years.
```

4

1  Q.  Did you participate in investigating this case, that is the
2      fraud scheme involving Mr. Figueredo, for the bank?
3  A.  Yes.
4  Q.  When did you first get involved?
5  A.  April 23rd, 2008.
6  Q.  That was shortly after a victim named EB complained to the bank?
7  A.  Yes.
8  Q.  Please explain briefly what was the -- what were the general
9      things you did as part of investigating this case.
10 A.  As part of the investigation we looked at the initial complaint
11     that was filed by EB with the bank to see the transactions that he
12     was disputing.
13        At that time we looked further into the transactions to
14     determine the validity, interviewed the customer, and obtained an
15     affidavit of the claim.
16 Q.  Sometime thereafter did Mr. Figueredo admit that he had
17     defrauded EB and other customers?
18 A.  Yes.
19 Q.  Did you speak with a number of customers in investigating this
20     case?
21 A.  Yes.
22 Q.  Approximately how many?
23 A.  Approximately 20.
24 Q.  As part of your role along with other bank representatives, did
25     you attempt to determine the amount of money that was

1  misappropriated from the bank?
2  A.    Yes.
3  Q.    How was that done?
4  A.    By receiving the claim affidavits from the individual claimants
5  as well as reviewing the statements.
6  Q.    In the course of this investigation, you actually talked with
7  the defendant as well, correct?
8  A.    Yes.
9  Q.    What information in general did the defendant give you about the
10 monies that were misappropriated?  Was he able to describe different
11 victims and different amounts?
12 A.    Yes, sir.
13 Q.    Mr. Vega, do you recognize Government's Exhibit 1?
14 A.    Yes.
15 Q.    What is it?
16 A.    A spreadsheet containing the listed dollar figures we were able
17 to obtain from the defendant, as well as the victims.
18       MR. DAVIS:  The Government would offer Exhibit 1 for
19 purposes of this sentencing, Your Honor.
20       THE COURT:  It will be received.
21 Q.    Was this a spreadsheet prepared by you or someone else?
22 A.    It was prepared by someone else.
23 Q.    Did you participate in the investigation that lead to the
24 preparation of this spreadsheet?
25 A.    Yes, I did.

6

1  Q. Are you familiar with the general figures in this spreadsheet
2  and how they were reached?
3  A. Yes.
4  Q. The first three columns are relatively self explanatory.
5  A. Yes.
6  Q. The last name of the victim identified by initial, correct?
7  A. Yes.
8  Q. The first name identified once again by initial?
9  A. Yes.
10 Q. The last four numbers of different accounts involved in the
11 case?
12 A. Yes.
13 Q. I would like to jump over to the third column from the right
14 where it says loss per Ricardo's admission. Who is Ricardo?
15 A. The defendant, Mr. Figueredo.
16 Q. Where it says per Ricardo, is that a part of the information
17 that he provided you in the bank's investigation?
18 A. Yes.
19 Q. How were these figures provided to you?
20 A. Verbally.
21 Q. At one time or over a number of meetings?
22 A. This was over a number of meetings with Mr. Figueredo.
23 Q. How is it that he was able to recall these figures, if you
24 recall?
25 A. He recalled them mentally. He was able to pull them up from his

1  memory.
2  Q. Did he make certain adjustments?
3  A. I don't recall.
4  Q. If you go to the bottom of the first and second page, is there a
5  total for the amount that Mr. Figueredo told you he misappropriated
6  from the different customers?
7  A. Yes.
8  Q. Could you read that for the record?
9  A. $29,497,732.
10 Q. I want to go to the column immediately to the left of loss per
11 Ricardo's admission where it says customer filed claims. What does
12 that refer to?
13 A. The dollar figures we obtained through the customer affidavits
14 and their claims.
15 Q. When you say customer affidavits, what are you referring to?
16 A. The documents the customer signed making their claim to the bank
17 reporting their losses.
18 Q. Did all of the customers provide affidavits?
19 A. No.
20 Q. Do the customer filed claims also include what the customers
21 claimed per a demand letter or a lawsuit?
22 A. Yes, the dollar figure is included in there.
23 Q. So some would have been affidavits, some would have been a
24 different form of claim?
25 A. Yes.

1  Q. As part of this process of determining the customer claims, did
2  you actually meet with a number of customers?
3  A. Yes.
4  Q. Approximately how many?
5  A. Approximately 20.
6  Q. What did this process involve?
7  A. The process involved reviewing the customers statements and
8  getting their affidavits signed to show exactly what they were
9  claiming to the bank as losses.
10 Q. What about review of records?
11 A. Reviewing their records on a line by line basis to determine
12 unauthorized and authorized transactions.
13 Q. Was the process of determining the customer filed complaints
14 easier for some customers as opposed to others?
15 A. Yes.
16 Q. Explain why that was the case.
17 A. Some of the customers had numerous transactions that were
18 unauthorized and some of them had less transactions.
19 Q. I would like to go to the second customer from the top of page
20 one, the customer's initial is EB, E as in Ellen and B as in Brown.
21 Is this someone who would have been easier or more difficult to
22 determine the loss amount?
23 A. It would have been easier.
24 Q. Why is that?
25 A. There were only two transactions conducted on that particular

1  account.
2  Q. Those transactions were?
3  A. Two separate withdrawals from two separate CDs.
4  Q. That totaled how much?
5  A. 1.2 million dollars.
6  Q. This person, EB, is this the person who complained to the bank
7  in April of 2008 that triggered the investigation in this case?
8  A. Yes.
9  Q. If we go to the line above EB, JA, is this someone who would
10 have been more difficult to determine a loss amount?
11 A. Yes.
12 Q. Why was that?
13 A. There were numerous transactions that passed through the account
14 that we had to determine line by line what was unauthorized and what
15 was authorized.
16 Q. How did you do that?
17 A. We sat with the client and the records had them go line by line
18 and advise us whether it was unauthorized or not.
19 Q. What is the customer's filed claim for JA?
20 A. $5,285,400.66.
21 Q. What is the column to the left, CD claims?  What does that refer
22 to?
23 A. CD claims -- the claims filed for CDs that the customers owned.
24 Q. What do the lines -- or the columns debits and credits, what do
25 they refer to?

1  A.   Those are the unauthorized transactions that went through the
2  customers' accounts that we obtained by going through the line by
3  line analysis.
4  Q.   With the customers?
5  A.   Yes.
6  Q.   If you were to take the debits, subtract the credits, and add
7  the CDs, what is the amount that you would have reached?
8  A.   $5,285,400.66.
9  Q.   How did that compare to the amount that Mr. Figueredo admitted
10 misappropriating?
11 A.   It was consistent with the dollar amount he provided.
12 Q.   Going to the next line, EB.  The 1.2 million dollars that EB
13 said was misappropriated, how did that compare with Mr. Figueredo's
14 admission?
15 A.   It was accurate.
16 Q.   Going to the fourth entry, for YB.  Did the bank follow the same
17 process with YB?
18 A.   Yes.
19 Q.   What is the amount that YB claims?
20 A.   $470,637.52.
21 Q.   How did that compare to Mr. Figueredo's admission?
22 A.   It was consistent.
23 Q.   Going to the sixth line, OD.  Did you follow the same process
24 there?
25 A.   Yes.

1  Q.   What was the amount that OD claimed?
2  A.   $1,862,489.17.
3  Q.   How much did Mr. Figueredo say he misappropriated from OD?
4  A.   Two million dollars.
5  Q.   There's a lot of blank areas under debits and credits for
6       certain customers.  Notwithstanding those areas that were blank, do
7       you recall going over transactions with those customers as well?
8  A.   We reviewed the statements.  However, in some cases the
9       customers reviewed the transactions themselves and provided
10      affidavits.
11 Q.   So in some cases the customers backed out the transactions on
12      their own?
13 A.   Correct.  They provided us with a net figure.
14 Q.   Let's go to the bottom line.  For all of the customers who have
15      either provided affidavits, submitted demand letters, or filed
16      lawsuits, what is the total amount they claim was misappropriated
17      from their accounts?
18 A.   The people I met with?
19 Q.   Let me try the question again.  Go to the bottom line of the
20      second page.  For the 20 or so customers who either filed
21      affidavits, presented demand letters, or initiated lawsuits, what is
22      the total amount they claimed was misappropriated from their
23      accounts?
24 A.   $29,649,419.47.
25 Q.   How did that compare to what Mr. Figueredo said he

1  misappropriated from those customers?
2  A.    It was consistent.
3  Q.    Did the amounts that these customers claimed include the
4  interest that was owed to them on their accounts?
5  A.    No.
6  Q.    That would have been a separate amount?
7  A.    Yes.
8  Q.    I know you are not a lawyer, but is the bank in some sort of
9  settlement discussion or litigation with a number of these
10 customers?
11 A.    Yes.
12 Q.    Does this amount represent the amount the bank believes they're
13 legally obligated to pay or just the amount it believes to the best
14 of its conclusion was misappropriated from these accounts?
15 A.    It is the amount believed to be misappropriated.
16 Q.    So there may be separate legal issues between the bank and its
17 customers?
18 A.    Yes.
19 Q.    What limitation did the bank have on records it was able to
20 review?  Was there some kind of time issue?
21 A.    Yes, the record retention went back seven years.
22 Q.    How long does the scheme go back?
23 A.    According to Mr. Figueredo's admission, it went back to at least
24 the mid 90's.
25 Q.    Has the bank tried to, to its best ability, back out all the

13

1   unauthorized transactions?
2   A.   Yes.
3   Q.   To the best of the bank's ability, this 29 million dollar figure
4   is the net amount stolen?
5   A.   Yes.
6            MR. DAVIS:   Thank you.   That's all I have.
7            THE COURT:   Cross examination.
8            MR. EDELSTEIN:   Thank you.
9   Q.   Good morning, Mr. Vega.
10  A.   Good morning.
11  Q.   Let's start off by talking about the records.   The bank only has
12  access for records of the past seven years?
13  A.   Correct.
14  Q.   Does that mean that in terms of any unauthorized debits or
15  credits there would be no record of them if that occurred more than
16  seven years ago?
17  A.   Correct.
18  Q.   Part of the reason the bank is in litigation with some of these
19  customers is because of this problem with the records, correct?
20  A.   Yes.
21  Q.   It's difficult to ascertain what the loss amount is?
22  A.   Yes.
23  Q.   So you have to depend in large part upon my client's memory and
24  the information he provided in his debriefing, correct?
25  A.   Yes.

**CONFIDENTIAL INFORMATION**

Customers Claiming Fraud by Ricardo Figueredo

| Last Name | First Name | Account(s) ending in | Debits | Credits | CD Claims | Customer Filed Claim | Loss per Ricardo admission | Affidavit of Claim | Demand or Complaint |
|---|---|---|---|---|---|---|---|---|---|
| A | J | 6305 0830 9034 | $2,597,343.19 | -$2,000,942.53 | $4,689,000.00 | $5,265,400.66 | $5,000,000.00 | Y | |
| B | E | 0925 7491 | $0.00 | $0.00 | $1,200,000.00 | $1,200,000.00 | $1,200,000.00 | | Demand |
| D | M | 1606 | | | | $289,500.00 | $289,500.00 | | Paid |
| S | R | 5355 | | | | $593,259.84 | $567,654.00 | | Demand |
| B | Y | 5605 4361 4406 5663 4464 | | -$98,495.00 | $569,132.52 | $470,637.52 | $382,000.00 | Y | |
| M | S | 5974 2962 3023 9222 9284 | $155,665.22 | -$150,000.00 | $844,287.94 | $847,287.94 | $850,000.00 | Y | |
| D | O | 4003 9848 9723 4375 4386 | $298,312.36 | -$432,641.21 | 1,996,818 | $1,862,489.17 | $2,000,000.00 | Y | |
| A | M,J | 4764 7205 5379 0341 3923 5975 1082 | | | | $944,451.75 | $1,016,000.00 | Y | |


EXHIBIT #20

**CONFIDENTIAL INFORMATION**

## Customers Claiming Fraud by Ricardo Figueredo

| Last Name | First Name | Account(s) ending in | Debits | Credits | CD Claims | Customer Filed Claim | Loss per Ricardo admission | Affidavit of Claim | Demand or Complaint |
|---|---|---|---|---|---|---|---|---|---|
| G | Ju | 7274<br>7842<br>7855<br>1818<br>4526<br>2685 | | | | $2,226,663.73 | $2,490,000.00 | Y | Y |
| G | S | | | | | $270,727.00 | $268,700.00 | Y | |
| G | Jo | 1568 | $182,787.28 | -$57,040.00 | | $125,747.28 | $110,502.00 | Y | |
| G | V | 2032 | | | | $7,473,604.00 | $7,351,818.00 | | Demand |
| H | S | 9563 | | | | $1,800,000.00 | $1,800,000.00 | Not Finalized | |
| J | J | 4252 | | | | $646,899.86 | $654,875.00 | | Demand |
| M | A | 2279 | | | | $226,032.85 | $209,679.00 | Y | |
| N | R | 0169 | | | $2,275,000.00 | $2,275,000.00 | $2,275,000.00 | | Complaint |
| N<br>D | A<br>M | 4704<br>1684 | | | | No Contact | $252,104.00 | | |
| O | J | 4087 | | | | $300,000.00 | $182,000.00 | | Paid |
| O | J | 1094<br>8627 | | | | $195,679.52 | $237,000.00 | Y | |
| R | G | 9323<br>3992 | | | | $214,000.00 | $251,100.00 | Y | |
| S | V | 6718 | | | | $260,538.35 | $200,000.00 | | Complaint |
| S | L | 1671 | | | | $2,142,000.00 | $2,110,000.00 | | Demand |
| | | | | | | $29,849,419.47 | $29,497,732.00 | | |

2